IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

CASSANDRA WILLIAMS,       )
    Plaintiff,           )
                          )
       v.               )      Civil No. 3:18-cv-564 (HEH)
                          )
ANDREW M. SAUL,[1]        )
Commissioner of Social Security,  )
    Defendant.        )
_____)

REPORT AND RECOMMENDATION

On October 31, 2014, Cassandra Williams ("Plaintiff") applied for Social Security

Disability Benefits ("DIB") and for Supplemental Security Income ("SSI") under the Social

Security Act (the "Act"), alleging disability from heart failure, bad kidney function, sleep apnea,

enlarged heart, extremely uncontrolled high blood pressure, fluid in lungs and heart stops at any

time, with an alleged onset date of September 10, 2014. The Social Security Administration

("SSA") denied Plaintiff's claims both initially and upon reconsideration. Thereafter, an

Administrative Law Judge ("ALJ") denied Plaintiff's claims in a written decision and the

Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision as the final

decision of the Commissioner.

Plaintiff now seeks judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g),

arguing that the ALJ erred by: (1) affording little weight to the opinions of Adel Bishai, M.D.,

---

[1]    On June 4, 2019, the United States Senate confirmed Andrew M. Saul to a six-year term
as the Commissioner of Social Security. Pursuant to Federal Rule of Civil Procedure 25(d),
Commissioner Saul should be substituted for former Acting Commissioner Nancy A. Berryhill
as the defendant in this matter.

James O'Keefe, Pys.D., and Teresa Oswald, N.P.; and, (2) failing to account for Plaintiff's

moderate limitations in concentration, persistence and pace in her Residual Functional Capacity

("RFC") assessment.  (Mem. in Supp. of Pl.'s Mot. for Summ. J. ("Pl.'s Mem.") (ECF No. 15) at

7, 19.)  This matter now comes before the Court for a Report and Recommendation pursuant to

28 U.S.C. § 636(b)(1)(B) on the parties' cross-motions for summary judgment, rendering the

matter ripe for review.[2]  For the reasons that follow, the Court recommends that Plaintiff's

Motion for Summary Judgment (ECF No. 14) be GRANTED, that Defendant's Motion for

Summary Judgment (ECF No. 16) be DENIED and that the final decision of the Commissioner

be VACATED and REMANDED pursuant to the fourth sentence of 42 U.S.C. § 405(g).

## I.      PROCEDURAL HISTORY

On October 31, 2014, Plaintiff filed applications for DIB and SSI, with an alleged onset

date of September 10, 2014.  (R. at 178-79.)  The SSA denied these claims initially on July 27,

2015, and again upon reconsideration on November 30, 2015.  (R. at 178-79, 222-23.)  At

Plaintiff's written request, the ALJ held a hearing on August 23, 2017.  (R. at 42-114, 263.)  On

December 14, 2017, the ALJ issued a written opinion, denying Plaintiff's claims and concluding

that Plaintiff did not qualify as disabled under the Act, because Plaintiff could perform work

existing in significant numbers in the national economy.  (R. at 33-34.)  On June 12, 2018, the

Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision as the final

decision of the Commissioner subject to review by this Court.  (R. at 1-3.)

---

[2]      The administrative record in this case remains filed under seal, pursuant to E.D. Va. Loc.
R. 5 and 7(C).  In accordance with these Rules, the Court will endeavor to exclude any personal
identifiers such as Plaintiff's social security number, the names of any minor children, dates of
birth (except for year of birth), and any financial account numbers from its consideration of
Plaintiff's arguments, and will further restrict its discussion of Plaintiff's medical information to
only the extent necessary to properly analyze the case.

## II.   STANDARD OF REVIEW

In reviewing the Commissioner's decision to deny benefits, a court "will affirm the Social Security Administration's disability determination 'when an ALJ has applied correct legal standards and the ALJ's factual findings are supported by substantial evidence.'" *Mascio v. Colvin*, 780 F.3d 632, 634 (4th Cir. 2015) (quoting *Bird v. Comm'r of Soc. Sec. Admin.*, 699 F.3d 337, 340 (4th Cir. 2012)).  Substantial evidence requires more than a scintilla but less than a preponderance, and includes the kind of relevant evidence that a reasonable mind could accept as adequate to support a conclusion. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012); *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996).  Indeed, "the substantial evidence standard 'presupposes . . . a zone of choice within which the decision makers can go either way, without interference by the courts.  An administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision.'" *Dunn v. Colvin*, 607 F. App'x. 264, 274 (4th Cir. 2015) (quoting *Clarke v. Bowen*, 843 F.2d 271, 272-73 (8th Cir. 1988)).  To determine whether substantial evidence exists, the court must examine the record as a whole, but may not "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." *Hancock*, 667 F.3d at 472 (quoting *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005)); *see also Biestek v. Berryhill*, 139 S. Ct. 1148, 1157 (2019) (holding that the substantial-evidence inquiry requires case-by-case consideration, with deference to the presiding ALJ's credibility determinations).  In considering the decision of the Commissioner based on the record as a whole, the court must "take into account whatever in the record fairly detracts from its weight." *Breeden v. Weinberger*, 493 F.2d 1002, 1007 (4th Cir. 1974) (quoting *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951)).  The Commissioner's findings as to any fact, if substantial evidence in the record

3

supports the findings, bind the reviewing court to affirm regardless of whether the court disagrees with such findings. *Hancock*, 667 F.3d at 477. If substantial evidence in the record does not support the ALJ's determination or if the ALJ has made an error of law, the court must reverse the decision. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

The Social Security Administration regulations set forth a five-step process that the agency employs to determine whether disability exists. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *see Mascio*, 780 F.3d at 634-35 (describing the ALJ's five-step sequential evaluation). To summarize, at step one, the ALJ looks at the claimant's current work activity. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). At step two, the ALJ asks whether the claimant's medical impairments meet the regulations' severity and duration requirements. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). Step three requires the ALJ to determine whether the medical impairments meet or equal an impairment listed in the regulations. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). Between steps three and four, the ALJ must assess the claimant's residual functional capacity ("RFC"), accounting for the most that the claimant can do despite her physical and mental limitations. §§ 404.1545(a), 416.945(a). At step four, the ALJ assesses whether the claimant can perform her past work given her RFC. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). Finally, at step five, the ALJ determines whether the claimant can perform any work existing in the national economy. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).

### III.    THE ALJ'S DECISION

On August 23, 2017, the ALJ held a hearing during which Plaintiff (represented by counsel) and a vocational expert ("VE") testified. (R. at 42-114.) On December 14, 2017, the ALJ issued a written opinion, finding that Plaintiff did not qualify as disabled under the Act. (R. at 14-34.)

The ALJ followed the five-step evaluation process established by the Social Security Act in analyzing Plaintiff's disability claim. (R. at 16-33.) At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since her alleged onset date of September 10, 2014. (R. at 17.) At step two, the ALJ found that Plaintiff had the severe impairments of congestive heart failure, spine disorder, bilateral carpal tunnel syndrome, obesity, depressive disorders, anxiety disorders, post-traumatic stress disorder ("PTSD") and bipolar disorder. (R. at 17.) At step three, the ALJ found that Plaintiff's impairments did not meet or equal one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 18-21.)

In assessing Plaintiff's RFC, the ALJ found that Plaintiff could perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b) with additional limitations. (R. at 21.) Specifically, Plaintiff required an additional sit/stand option. (R. at 21.) Plaintiff could also frequently handle and finger, occasionally climb ramps and stairs, occasionally balance, stoop, kneel and crouch, and occasionally work in dust, odors, fumes and other pulmonary irritants. (R. at 21.) Further, the ALJ found that Plaintiff could perform simple, routine tasks, occasionally interact with supervisors and co-workers, and tolerate few changes in a routine work setting. (R. at 21.) Plaintiff could never climb ladders, ropes or scaffolds, crawl, work at unprotected heights or around moving mechanical parts, or interact with the public. (R. at 21.)

At step four, the ALJ found that Plaintiff could not perform any past relevant work. (R. at 32.) At step five, the ALJ determined that Plaintiff could perform jobs existing in significant numbers in the national economy, including work as a folder and mail clerk. (R. at 32-33.) Therefore, Plaintiff did not qualify as disabled under the Act. (R. at 33.)

IV.   ANALYSIS

Plaintiff, age thirty-seven at the time of this Report and Recommendation, previously worked as a home health aide.  (R. at 32, 312, 322.)  She applied for SSI and DIB, alleging disability from heart failure, bad kidney function, sleep apnea, enlarged heart, extremely uncontrolled high blood pressure, fluid in her lungs and heart stops, with an alleged onset date of September 10, 2014.  (R. at 312, 315.)  Plaintiff's appeal to this Court alleges that the ALJ erred by: (1) affording little weight to the opinions of Dr. Bishai, Dr. O'Keefe and Nurse Oswald; and, (2) failing to account for Plaintiff's moderate limitations in concentration, persistence and pace in her RFC assessment.  (Pl.'s Mem. at 7, 19.)  For the reasons set forth below, the ALJ erred in her decision.

### A.    The ALJ Did Not Err in Assigning Little Weight to the Medical Opinions of Dr. Bishai, Dr. O'Keefe and Nurse Oswald.

During the sequential analysis, when the ALJ determines whether the claimant has a medically-determinable severe impairment, or combination of impairments, that would significantly limit the claimant's physical or mental ability to do basic work activities, the ALJ must analyze the claimant's medical records that are provided and any medical evidence resulting from consultative examinations or medical expert evaluations that have been ordered. 20 C.F.R. §§ 404.1512, 404.1527, 416.912, 416.927.  When the record contains a number of different medical opinions, including those from Plaintiff's treating sources, consultative examiners or other sources that are consistent with each other, then the ALJ makes a determination based on that evidence.  §§ 404.1527(c), 416.927(c).  If, however, the medical opinions are inconsistent internally with each other or other evidence, the ALJ must evaluate the opinions and assign them respective weight to properly analyze the evidence involved. §§ 404.1527(c)(2)-(6), (d), 416.927(c)(2)-(6), (d).

Under the regulations, only an "acceptable medical source" may be considered a treating source that offers an opinion entitled to controlling weight. SSR 06-3p.[3] Acceptable medical sources include licensed physicians, licensed or certified psychologists and certain other specialists, depending on the claimed disability. §§ 404.1513(a), 404.1527(a), 416.913(a), 416.927(a). The regulations also provide for the consideration of opinions from "other sources," including nurse-practitioners, physician's assistants or therapists. SSR 06-03p; §§ 404.1527(f), 416.927(f).[4] Under the applicable regulations and caselaw, a treating source's opinion must be given controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record. §§ 404.1527(c)(2), 416.927(c)(2); *Lewis v. Berryhill*, 858 F.3d 858, 867 (4th Cir. 2017); *Craig*, 76 F.3d at 590; SSR 96-2p. Further, the regulations do not require that the ALJ accept opinions from a treating source in every situation, *e.g.*, when the source opines on the issue of whether the claimant is disabled for purposes of employment (an issue reserved for the Commissioner), or when the treating source's opinion is inconsistent with other evidence or when it is not otherwise well-supported. §§ 404.1527(c)(3)-(4), (d), 416.927(c)(3)-(4), (d).

---

[3]     Effective March 27, 2017, the SSA rescinded SSR 96-2p and 06-3p, instead incorporating some of the Rulings' policies into 20 C.F.R. §§ 404.1527(f), 416.927(f). 82 Fed. Reg. 5844-01, at 5844-45, 5854-55 (Jan. 18, 2017). Plaintiff filed her claims on October 31, 2014, before this regulation took effect. (R. at 178-79.) The Agency does not have the power to engage in retroactive rulemaking. *Compare Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988) (requiring Congress to expressly convey the power to promulgate retroactive rules due to its disfavored place in the law), *with* 42 U.S.C. § 405(a) (granting the Agency the general power to make rules, but not granting retroactive rulemaking power). Because the regulation does not have retroactive effect, SSR 06-03p applies to Plaintiff's claims.

[4]     The regulations detail that "other sources" include medical sources that are not considered "acceptable medical sources" under 20 C.F.R. §§ 404.1527(f) and 416.927(f). The given examples are a non-exhaustive list. SSR 06-03p.

Courts generally should not disturb an ALJ's decision as to the weight afforded a medical opinion absent some indication that the ALJ "dredged up 'specious inconsistences.'" *Dunn v. Colvin*, 607 F. App'x 264, 267 (4th Cir. 2015) (citing *Scivally v. Sullivan*, 966 F.2d 1070, 1077 (7th Cir. 1992)).  Indeed, an ALJ's decision regarding weight afforded a medical opinion should be left untouched unless the ALJ failed to give a sufficient reason for the weight afforded. *Id.*

The ALJ must consider the following when evaluating a treating source's opinion: (1) the length of the treating source relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) supportability based upon the medical record; (4) consistency between the opinion and the medical record; (5) any specialization on the part of the treating source; and, (6) any other relevant factors.  §§ 404.1527(c), 416.927(c).  However, those same regulations specifically vest the ALJ — not the treating source — with the authority to determine whether a claimant is disabled as that term is defined under the Act. §§ 404.1527(d)(1), 416.927(d)(1).  Although the regulations explicitly apply these enumerated factors only to treating sources, those same factors may be applied in evaluating opinion evidence from "other sources."  SSR 06-03p.

### 1.  *The ALJ Properly Afforded Little Weight to the Opinions of Dr. Bishai.*

Plaintiff first argues that Dr. Bishai's opinions comport with the record and that the ALJ did not properly weigh Dr. Bishai's opinions with respect to his status as a treating source.  (Pl.'s Mem. at 10-14.)  Defendant argues that Dr. Bishai's opinions contained conclusory statements on issues reserved for the Commissioner and conflicted with the record; thus, substantial evidence supports the ALJ's decision.  (Def.'s Mem. in Supp. of Def.'s Mot. for Summ. J. ("Def.'s Mem.") (ECF No. 16) at 15-18.)

####     a.     *Dr. Bishai's October 2015, December 2015 and April 2017 Opinions*

Dr. Bishai treated Plaintiff for congestive heart failure, back pain, anxiety, depression,

general sickness and other issues from 2015 through 2017. (R. at 932-41, 1177-84, 1423-77,

1692-99.) The ALJ considered four separate opinions from Dr. Bishai from October 2015,

December 2015, April 2017 and June 2017. (R. at 30.) On October 12, 2015, Dr. Bishai

completed a form from the Virginia Employment Commission. (R. at 1186.) On the form, Dr.

Bishai stated that Plaintiff experienced chest pain and back pain that "radiate[d] downward" and

he noted that Plaintiff had been unable to work since October 2014. (R. at 1186.) Dr. Bishai

also checked a box stating that Plaintiff could not perform any work. (R. at 1186.)

On December 15, 2015, Dr. Bishai sent a letter to a law firm, declaring Plaintiff "100

percent unemployable for any job due to the following health conditions: chest pain, back pain,

major depression, stress, anxiety, [congestive heart failure], sleep apnea and hypertension." (R.

at 1253.) Dr. Bishai then opined that Plaintiff would remain unemployable for a period of twelve

months. (R. at 1253.)

On April 6, 2017, Dr. Bishai conducted a medical evaluation of Plaintiff for the

Department of Social Services in which he indicated that Plaintiff could not perform employable

work for a period of twelve months. (R. at 1256-57.) Dr. Bishai indicated that Plaintiff had

physical limitations caused by back pain, right knee pain and a herniated disc, as well as mental

health limitations caused by severe depression and bipolar disorder. (R. at 1257.) Ultimately,

Dr. Bishai recommended that Plaintiff apply for SSI or SSDI. (R. at 1257.)

The ALJ deemed Dr. Bishai's opinions from October 2015, December 2015 and April

2017 "conclusory" and lacking in "any specific functional limitations or abilities[;]" thus, the

ALJ afforded those opinions little weight. (R. at 30, 1186, 1253, 1256-57.) The regulations

9

define "medical opinions" as "statements from acceptable medical sources that reflect judgments about the nature and severity of [the claimants] impairment(s), including [the claimant's] symptoms, diagnosis and prognosis, *what [the claimant] can still do despite impairment(s)*, and [the claimant's] physical or mental restrictions." §§ 404.1527(a)(1), 416.927(a)(1) (emphasis added). Although Dr. Bishai's opinions from October 2015, December 2015 and April 2017 described Plaintiff's symptoms and diagnoses (i.e., back pain, chest pain, depression, sleep apnea, etc.), Dr. Bishai made no findings in those opinions regarding Plaintiff's physical or mental functional limitations. (R. at 1186, 1253, 1256-57.) Rather, Dr. Bishai simply opined that Plaintiff's condition rendered her unable to work, but the regulations make clear that the ultimate question of disability is reserved for the Commissioner. §§ 404.1527(d)(1), 416.927(d)(1) ("A statement by a medical source that [the claimant is] 'disabled' or 'unable to work' does not mean that we will determine that [the claimant is] disabled."); *see also* §§ 404.1527(d)(3), 416.927(d)(3) ("We will not give any special significance to the source of an opinion on issues reserved to the Commissioner[.]"). Accordingly, the ALJ did not err in affording Dr. Bishai's October 2015, December 2015 and April 2017 opinions little weight.

### b.    *Dr. Bishai's June 2017 Opinion*

On June 1, 2017, Dr. Bishai completed a Residual Functional Capacity Questionnaire. (R. at 1484-88.) Dr. Bishai diagnosed Plaintiff with back pain, spinal stenosis, carpal tunnel syndrome and depression. (R. at 1486.) Dr. Bishai indicated that Plaintiff would need to lie down/recline more frequently than the usual breaks provided during an eight-hour workday. (R. at 1486.) Dr. Bishai further noted that Plaintiff: (1) could walk only one city block without rest or significant pain; (2) could sit for thirty minutes to one hour and stand/walk for thirty minutes to one hour during an eight-hour workday; (3) required a job that permitted shifting positions at

will; and, (4) required a twenty-to-thirty-minute, unscheduled break every hour during an eight-hour workday. (R. at 1486.) Dr. Bishai opined that Plaintiff could lift less than ten pounds occasionally and could never lift anything heavier. (R. at 1487.) He also noted that Plaintiff had limitations in reaching, handling and fingering, precluding Plaintiff from using her hands to grasp, turn or twist objects, and he opined that Plaintiff could use her fingers for fine manipulation only 10 percent of the time and her arms for reaching only 5 percent of the time. (R. at 1487.) Dr. Bishai estimated that Plaintiff's impairments likely would cause her to miss work more than four times per month and that Plaintiff would be unable to complete a regular workweek on a sustained basis. (R. at 1487.)

The ALJ afforded Dr. Bishai's June 2017 opinion little weight, explaining that it proved inconsistent with the evidence as a whole. (R. at 30, 1484-88.) The ALJ acknowledged that, although Plaintiff experienced "significant reduced heart functioning in October 2014," Plaintiff had a normal ejection fraction[5] in January 2015, and she received conservative treatment for her conditions. (R. at 30.) Furthermore, the ALJ found that Plaintiff's own descriptions of her daily activities indicated a greater functional capacity than Dr. Bishai endorsed. (R. at 30.) The ALJ cited to Plaintiff's testimony that she could "care for her two young children, prepare meals, wash dishes, drive, shop in stores, manage finances, attend church, finish what she starts, follow instructions, read, write, visit family, and do household chores." (R. at 30.) Thus, the ALJ concluded that Plaintiff's functional capacity exceeded what Dr. Bishai endorsed. (R. at 30.)

---

[5]      An ejection faction describes "the proportion of the volume of blood in the ventricles at the end of diastole that is ejected during systole; it is the stroke volume divided by the end diastolic volume, often expressed as a percentage. It is normally 65 [plus or minus] 8; lower values indicate ventricular dysfunction." *Ejection Fraction*, Dorland's Illustrated Medical Dictionary (32d ed. 2012).

Plaintiff argues that the ALJ's reliance on Plaintiff's normal ejection fraction in January 2015 requires remand, because the ALJ provided no citation to the record and improperly interpreted raw medical data. (Pl.'s Mem. at 14 ("It is unclear whose interpretation of this raw medical data would allow the ALJ to make such a decision [sic] as the ALJ gives no citation.").) But the fact that the ALJ did not cite to a precise exhibit and page number does not deprive the Court of its ability to meaningfully review the ALJ's decision. *See Sharp v. Colvin*, 660 F. App'x 251, 257 (4th Cir. 2016) ("While the ALJ did not cite specific pages in the record, his explanation relied on and identified a particular category of evidence [the doctor's office notes]."). Indeed, the ALJ specifically referenced Plaintiff's January 2015 medical records, which revealed that, on January 13, 2015, Plaintiff presented to Melissa C. Smallfield, M.D., at Virginia Commonwealth University ("VCU") Health Systems' cardiology clinic. (R. at 768.) Dr. Smallfield reviewed Plaintiff's cardiac MRI from January 6, 2015, and she noted that it revealed normal ejection fraction. (R. at 768, 777.) Rather than interpret raw medical data, as Plaintiff contends, the ALJ appropriately cited Dr. Smallfield's reading of Plaintiff's cardiac MRI in discounting Dr. Bishai's opinion. (R. at 30.)

In addition to Plaintiff's improved heart condition, the ALJ cited to Plaintiff's conservative treatment history — noting the lack of evidence that Plaintiff's condition required "more invasive treatment" — and Plaintiff's activities of daily living in support of her decision to afford Dr. Bishai's June 2017 opinion little weight. (R. at 30.) Contrary to Plaintiff's assertion, the ALJ's explanation satisfied her duty to "build an accurate and logical bridge from the evidence to [her] conclusion." *Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016) (quoting *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000)); (Pl.'s Mem. at 13 ("This explanation does not comport with the regulations, nor does it make logical sense.").) Substantial evidence,

including Plaintiff's medical records, testimony and reported activities of daily living, supports the ALJ's decision.

### i.      Plaintiff's Heart Problems and Chest Pain

As the ALJ noted, Plaintiff's heart condition improved following her October 2014 hospitalization. (R. at 30.) On October 27, 2014, Plaintiff presented to the emergency department at VCU Health Systems, exhibiting a cough, shortness of breath and chest pressure. (R. at 418.) Plaintiff had a left ventricle ejection fraction ("LVEF") of 25-30 percent and uncontrolled hypertension. (R. at 471-72.) Treating staff diagnosed her with congestive heart failure. (R. at 453.)

Plaintiff underwent a myocardial perfusion imaging study at VCU Health Systems on November 3, 2014, which revealed a mildly reduced global systolic function with a mildly decreased LVEF of 47 percent. (R. at 499.) Plaintiff also alerted medical staff that she underwent a sleep study and had been diagnosed with sleep apnea. (R. at 453.) Upon discharge, Plaintiff received a continuous positive airway pressure ("CPAP") machine from the hospital to assist with the sleep apnea. (R. at 453.)

On November 11, 2014, Plaintiff presented to Dr. Smallfield at VCU Health Systems' cardiology clinic for evaluation of her pulmonary hypertension and congestive heart failure. (R. at 549-52.) Dr. Smallfield described Plaintiff as emotional during the interview and positive for depression. (R. at 551-52.) Plaintiff reported feeling tired and told Dr. Smallfield that she still took care of her children, cooked and performed housework, but she had to take breaks to rest. (R. at 550.) Dr. Smallfield noted that Plaintiff did not properly use the CPAP machine given to her upon discharge from the hospital and instructed Plaintiff to use the CPAP machine for at least four hours every night. (R. at 550-52.)

13

On January 13, 2015, Plaintiff returned to Dr. Smallfield, complaining of headaches, numbness in her hands and legs, shortness of breath, dizziness when bending over, fatigue and mild chest pain. (R. at 768-69.) Dr. Smallfield noted that Plaintiff's medications might have caused her headaches and abnormal sensations and changed Plaintiff's prescription and dosages in an attempt to alleviate those issues. (R. at 768, 770.) Dr. Smallfield also reviewed Plaintiff's January 6, 2015 cardiac MRI, which revealed a normal LVEF and no signs consistent with sarcoid. (R. at 769, 777.) On January 30, 2015, treating staff at VCU Health Systems conducted an echocardiogram on Plaintiff's heart and issued a Transthoracic Echocardiography Report, which again revealed that Plaintiff had a LVEF in the normal range of 55-60 percent. (R. at 763-64.) Compared to the study conducted on Plaintiff's heart during her October 2014 hospitalization, (R. at 421-23, 437), the report showed improvement in the biventricular systolic function and a decrease in mitral regurgitation, (R. at 763-64).

On February 20, 2015, Plaintiff returned to Dr. Smallfield for a follow-up examination regarding her congestive heart failure. (R. at 1568.) Plaintiff reported feeling worse with respect to her energy level and memory, but she denied experiencing chest pain. (R. at 1569.) Plaintiff also stated that she continued to care for her children, though she needed to take breaks when completing household chores. (R. at 1569.) Again, Plaintiff admitted to using her CPAP machine only "sometimes." (R. at 1569.)

On April 8, 2015, Plaintiff presented to the emergency room, complaining of a sharp chest pain on the left side, causing numbness and tingling in her left arm. (R. at 896, 899.) Plaintiff believed that the father of her children leaving the family exacerbated her pain. (R. at 899.) On physical examination, Paulo M. Gazoni, M.D., noted that Plaintiff had a normal heart rate and rhythm and clear lungs. (R. at 901.) Plaintiff appeared tearful and angry when

describing her history, but Dr. Gazoni observed no focal neurological deficit and he described her mood as cooperative, yet labile. (R. at 901.) Ultimately, Dr. Gazoni diagnosed Plaintiff with "emotionally induced chest pain," and he instructed Plaintiff to avoid stressful situations. (R. at 901.) On April 13, 2015, Plaintiff returned to Dr. Smallfield, complaining of chest pain and depression. (R. at 888.) Dr. Smallfield noted that Plaintiff had a normal LVEF but remained noncompliant with her CPAP machine use. (R. at 888.)

On June 11, 2015, Plaintiff met with Amit Varma, M.D., for a cardiology follow-up examination. (R. at 1101-1110.) Plaintiff denied having chest pains but felt increased anxiety and depression. (R. at 1103-05.) Dr. Varma observed no worsening cardiac symptoms. (R. at 1104.) Although Plaintiff had an elevated heart rate, her blood pressure fell within the goal range. (R. at 1104.) Dr. Varma assessed Plaintiff as suffering from chronic systolic heart failure with NYHA class II symptoms, pulmonary arterial hypertension, depression and tachycardia. (R. at 1109-10.)

Plaintiff returned to Dr. Smallfield for a follow-up cardiac examination on November 6, 2015. (R. at 1506-09.) Although Plaintiff had elevated blood pressure, she had a normalized ejection fraction. (R. at 1506-07.) Plaintiff reported experiencing chest tightness that resolved with a few minutes of meditation. (R. at 1507.) Dr. Smallfield noted that Plaintiff failed to take her blood pressure medication as prescribed and increased the dosage. (R. at 1507-09.)

The next year, on November 23, 2016, Plaintiff went to the Dominion Heart & Vascular Clinic to address continuing chest pain. (R. at 1457.) Plaintiff denied experiencing shortness of breath, but stated she felt depressed and appeared teary eyed throughout the interview. (R. at 1457.) The clinic assessed her chest pain as "non-cardiac in etiology" and noted that Plaintiff failed to use her CPAP machine, because it stopped working. (R. at 1458.) Treating staff

advised Plaintiff to continue taking her medication, stop smoking and return to using her CPAP machine. (R. at 1458.) Plaintiff underwent an echocardiogram on December 15, 2016, which showed a normal LVEF and only mild mitral regurgitation, tricuspid regurgitation and aortic insufficiency. (R. at 1354.)

Together, these records demonstrated that Plaintiff's heart problems and chest pain improved over time, supporting the ALJ's finding that Plaintiff retained greater functional capacity than Dr. Bishai endorsed.

### ii.     Plaintiff's Back Pain, Knee Pain and Numbness

Dr. Bishai's June 2017 opinion listed back pain, knee pain and finger numbness as the primary physical symptoms rendering Plaintiff incapable of working, (R. at 1486-87), but Dr. Bishai's own treatment notes, which consisted primarily of check-the-box forms, demonstrated that Plaintiff retained greater functional capacity than Dr. Bishai described. For instance, Dr. Bishai stated that Plaintiff could only stand or walk for thirty minutes to one hour during an eight-hour workday. (R. at 1486.) During several appointments, Dr. Bishai did not check the box indicating that Plaintiff walked with a normal gait, (R. at 941, 1181, 1444, 1453, 1464, 1467, 1471, 1473-74), but the majority of Dr. Bishai's treatment notes reflected that Plaintiff had a normal gait, (R. at 1182-83, 1437, 1445-47, 1450-52, 1460-61, 1463, 1465, 1470, 1472, 1468).

Accounting for Plaintiff's finger numbness, Dr. Bishai opined that Plaintiff could not use her hands to grasp, turn or twist objects, and that she could only use her fingers for fine manipulation 10 percent of the time and her arms for reaching only 5 percent of the time, (R. at 1487), but Dr. Bishai checked boxes indicating that Plaintiff displayed intact cranial nerves and normal motor and sensory functions during appointments in April 2015, August 2015, September 2015, November 2015, December 2015, February 2015, April 2016, June 2016 and August 2016.

(R. at 941, 1182-83, 1466-68, 1471, 1474-75.)  These unremarkable physical examinations prove inconsistent with Dr. Bishai's June 2017 opinion.

The rest of the medical evidence of record pertaining to Plaintiff's physical impairments likewise conflicted with Dr. Bishai's June 2017 opinion.  On May 8, 2015, Plaintiff presented to the neurology department at VCU Health Systems for evaluation of her hand and leg numbness. (R. at 958.)  Plaintiff stated that the numbness disturbed her sleep and prevented her from writing for extended periods of time.  (R. at 958-59.)  She also stated that the numbness evolved into a burning sensation.  (R. at 959.)

On September 10, 2015, Plaintiff presented to Kevon Hekmatdoost, M.D., for a neurology appointment at VCU Health Systems.  (R. at 1510-15.)  Plaintiff appeared alert and oriented, had normal motor strength, intact coordination and walked with a normal gait.  (R. at 1513-14.)  On September 12, 2015, Plaintiff returned to the neurology department for a follow-up appointment regarding the numbness in her hands and right leg.  (R. at 1161.)  Treating staff attempted to perform an electromyogram ("EMG"), but Plaintiff could not tolerate the full test. (R. at 1161-65.)  The portion of the EMG test that Plaintiff completed revealed normal results, including normal strength in both of Plaintiff's arms and legs.  (R. at 1161, 1163-64.) Additionally, Plaintiff had a normal gait and stance.  (R. at 1164.)  Treating staff found no reason to change Plaintiff's medication regimen given her "mild symptoms."  (R. at 1165.)

On November 10, 2015, Plaintiff presented to Jay Pavan, M.D., at Colonial Orthopaedics, complaining of lower back pain.  (R. at 1291-95.)  Although Plaintiff experienced tenderness in the paraspinal region at L5, Dr. Pavan noted that Plaintiff walked with a normal gait and had normal strength in her lower extremities.  (R. at 1292.)  Plaintiff had no reflex in her right ankle, but displayed normal reflexes in her left ankle and both knees and normal sensation in her

17

extremities. (R. at 1292.) Plaintiff had positive straight-leg raise test results on the right side, but negative results on the left. (R. at 1292.) Lumbar X-Rays of Plaintiff's spine revealed moderate disc-space narrowing at L5-S1 with normal remainder of the vertebral bodies and disc spaces. (R. at 1294.) Dr. Pavan prescribed Tramadol to Plaintiff and instructed her to avoid heavy lifting and frequent bending and to apply heat and ice to her troublesome areas as needed. (R. at 1294.) During follow-up appointments in December 2015 and January 2016, Plaintiff continued to complain of back pain, but she walked with a normal gait, displayed normal strength in her lower extremities and appeared pleasant and cooperative. (R. at 1285, 1288.)

On March 22, 2016 and April 12, 2016, Plaintiff presented to John W. Snyder, M.D., at Colonial Orthopaedics for two bilateral S1 Tansforaminal Epidural Steroid Injections to alleviate her lower back pain. (R. at 1276-80.) Plaintiff tolerated the procedures well, and she reported that "previously painful actions and maneuvers were less painful" post-procedure. (R. at 1277, 1280.) However, when Plaintiff returned to Dr. Snyder on June 9, 2016, Plaintiff reported no significant improvement. (R. at 1273.) Plaintiff reported experiencing a "stabbing" and "burning" back pain and complained that household activities such a cooking, washing dishes and doing laundry exacerbated her pain. (R. at 1273.)

On June 27, 2016, Plaintiff presented to Prakasam Kalluri, M.D., at Colonial Orthopedics, complaining of low back pain and left leg pain. (R. at 1267-70.) On examination, Plaintiff walked with a normal gait and displayed a normal mood and affect. (R. at 1269.) Although Plaintiff experienced tenderness in her spine and pain with deep flexion, Plaintiff displayed a normal range of motion. (R. at 1269.) Plaintiff also displayed normal motor and sensory function with the exception of abnormal ankle reflexes. (R. at 1269.) After reviewing Plaintiff's lumbar MRI, Dr. Kalluri recommended against back surgery and instead suggested

18

physical therapy to treat Plaintiff's back and leg pain. (R. at 1270.) Dr. Kalluri also discussed with Plaintiff "the need for a focused weight loss program with walking." (R. at 1270.)

On July 25, 2016, Plaintiff presented to the Southern Virginia Regional Medical Center for physical therapy on her lower back. (R. at 1355-62.) This consisted of physical exercises and hot/cold packs with the addition of a home exercise routine to treat and strengthen her lower back. (R. at 1361-62.) On August 24, 2016, Plaintiff presented to the emergency room after spraining her knee by getting her leg caught in a hole. (R. at 1344.)

The next year, on July 10, 2017, while at Southern Regional Medical Center for physical therapy, Plaintiff appeared very emotional and she cried throughout the session. (R. at 1703.) The physical therapist noted that Plaintiff could not perform some exercises due to pain, but also stated she had reached "rehab potential" and could perform home exercises independently. (R. at 1703.) On July 19, 2017, Mervet Elassal, M.D., examined Plaintiff and found only a mild decrease in the range of motion in her neck and no weakness in the upper extremities. (R. at 1710.) An electrodiagnostic study revealed evidence of mild bilateral carpal tunnel syndrome with sensory component affection. (R. at 1711.)

These records support the ALJ's finding that Plaintiff retained greater functional capacity than Dr. Bishai endorsed. (R. at 30.) Although Plaintiff experienced pain, numbness, a limited range of motion in the spine and reduced ankle reflexes, (R. at 958, 1161, 1269, 1273, 1281-82, 1292), she retained her ability to walk with a normal gait and displayed normal strength, normal reflexes and normal sensory and motor functioning throughout the record, (R. at 1045, 1269, 1285, 1288, 1292, 1514).

### iii.    *Plaintiff's Conservative Treatment*

In support of the weight assigned to Dr. Bishai's June 2017 opinion, the ALJ further relied on the fact that Plaintiff received "relatively conservative" treatment for her conditions and the lack of evidence indicating that Plaintiff required "more invasive treatment[.]" (R. at 30.) Indeed, an ALJ may consider the medications and treatments used to alleviate a claimant's symptoms to determine the extent of her impairments. 20 C.F.R. §§ 404.1529(c)(3)(iv)-(v), 416.929(c)(3)(iv)-(v). If the claimant requires only conservative treatment, an ALJ is reasonable in holding that the alleged disability lacks the seriousness that the claimant alleges. *Dunn*, 607 F. App'x at 274-75.

Here, Plaintiff's treatment providers primarily prescribed medication and physical therapy to treat Plaintiff's physical ailments. (R. at 1165, 1264, 1270, 1345.) Plaintiff also had two steroid injections in her back, which did not provide significant relief. (R. at 1273, 1276-80.) When those procedures proved ineffective, Dr. Kalluri still recommended against back surgery and suggested that Plaintiff focus on weight loss and physical therapy. (R. at 1270, 1273.)

This Court has acknowledged that "no bright-line rule [exists] between what constitutes 'conservative' versus 'radical' treatment," *Prince v. Berryhill*, 2017 WL 2872837, at \*5 (E.D. Va. June 19, 2017) (citing *Gill v. Astrue*, 2012 WL 3600308, at \*6 (E.D. Va. Aug. 21, 2012)), *report and recommendation adopted*, 2017 WL 2872421 (E.D. Va. July 5, 2017), and has found that substantial evidence supports an ALJ's decision to characterize a course of treatment that includes epidural steroid injections as "conservative," *see, e.g., Ross v. Berryhill*, 2019 WL 289101, at \*6 (E.D. Va. Jan. 3, 2019) (finding that ALJ appropriately relied on plaintiff's "conservative" treatment of back pain, which included two epidural steroid injections and

physical therapy), *report and recommendation adopted*, 2019 WL 281191 (E.D. Va. Jan. 22, 2019). Accordingly, the Court finds that the ALJ appropriately characterized Plaintiff's treatment as conservative and that substantial evidence supports such a finding.

### iv.    *Plaintiff's Depression*

Dr. Bishai also cited to Plaintiff's depression as one of the diagnoses contributing to her inability to work, and he opined that Plaintiff would need to take unscheduled breaks for twenty to thirty minutes every hour of the workday. (R. at 1486-87.) Although Plaintiff reported experiencing depression and anxiety, Dr. Bishai noted that Plaintiff appeared alert and oriented, with normal memory and normal mood and affect during appointments in August 2015, September 2015, December 2016 and June 2016. (R. at 1181-83, 1460, 1468.) The rest of Plaintiff's medical records further demonstrated that Plaintiff's depression did not debilitate her to the extent that Dr. Bishai opined.

On April 8, 2015, Dr. Gazoni diagnosed Plaintiff with "emotionally induced chest pain," and he instructed Plaintiff to avoid stressful situations after Plaintiff presented to the emergency room complaining of chest pain. (R. at 901.) Plaintiff appeared tearful and angry when describing her history, but Dr. Gazoni observed no focal neurological deficit and he described her mood as cooperative, yet labile. (R. at 901.) On April 13, 2015, Plaintiff presented as tearful and had outbursts during her appointment with Dr. Smallfield. (R. at 888.) Plaintiff reported having thoughts of suicide in the past, but denied presently experiencing suicidal ideations. (R. at 888.) Plaintiff declined Dr. Smallfield's request that Plaintiff go to the emergency room or to the psychiatry unit, start medication or meet with an outpatient social worker. (R. at 888.)

During a neurology appointment on May 8, 2015, Plaintiff mentioned feeling sad and having decreased appetite and motivation in addition to thoughts of "standing in front of the

highway." (R. at 959.) Plaintiff mentioned that she stopped taking her antidepressants, because they made her stomach burn. (R. at 959.) On June 25, 2015, Plaintiff reported "not . . . feeling better" to Dr. Koduri, but she had a normal appetite and fair energy level. (R. at 1139.) Plaintiff also denied suicidal or homicidal ideations. (R. at 1139.)

On January 20, 2016, Plaintiff returned to Dr. Koduri for a mental health follow-up examination. (R. at 1301.) Notably, Plaintiff denied experiencing depression or loss of interest in activities. (R. at 1301.) Plaintiff had a fair energy level and stated that her "heart [felt] better." (R. at 1301.) Again, Dr. Koduri observed no signs of suicidal or homicidal ideations. (R. at 1301.)

On August 4, 2016, Plaintiff returned to the emergency room at Southside Regional Medical Center, complaining of leg, chest and back pain. (R. at 1382-86.) Dr. Koduri visited Plaintiff for a mental health consultation after the hospital sent Plaintiff to its psychiatric unit. (R. at 1404-05.) Plaintiff admitted having suicidal thoughts to Dr. Koduri, but she made clear that she did not actually have a suicidal plan and wanted to go home. (R. at 1405.) Dr. Koduri noted that Plaintiff ran out of her medications and that this could have caused the panic, anxiety and chest pain that brought her to the emergency room. (R. at 1405.) Dr. Koduri noted that Plaintiff behaved in a demanding, blunt and rude manner in the past, but on examination, Plaintiff appeared alert, oriented and calm, with fair memory recall. (R. at 1406.) Dr. Koduri found "no evidence of significant depression," no evidence of suicidal thoughts, conversation or attempts, and no safety concerns. (R. at 1406.) Accordingly, the hospital discharged Plaintiff with medication, and Dr. Koduri recommended that Plaintiff see a local psychiatrist. (R. at 1406.)

During a follow-up appointment with Dr. Koduri on August 9, 2015, Plaintiff denied experiencing depression or loss of interest in activities, and she had a normal energy level and normal appetite. (R. at 1299.) Dr. Koduri described Plaintiff's overall condition as "stable" and recommended no changes to her medications. (R. at 1300.)

On December 27, 2016, Plaintiff presented to Nurse Oswald at Southern Virginia Behavioral Health and Sleep Medicine for a psychiatric evaluation. (R. at 1260-64.) Plaintiff reported not taking her medications as prescribed and "feeling increasing[ly] depressed and overwhelmed." (R. at 1263.) Plaintiff cited to the holidays and her significant other leaving her as factors exacerbating her condition. (R. at 1260-64.) During her mental status examination, Plaintiff displayed a sad, irritable mood and tearful affect, but she otherwise maintained a cooperative and calm demeanor with normal eye contact, normal speech volume and intact memory. (R. at 1263.) Plaintiff's insight, judgment and thought processes also appeared normal and intact, and she denied suicidal or homicidal ideations. (R. at 1263.)

Despite experiencing depression, Plaintiff retained a cooperative demeanor, appeared alert and oriented, denied suicidal and homicidal ideations, and demonstrated normal memory, judgment and insight throughout the record. (R. at 1139, 1181-83, 1263, 1299, 1301, 1404-05, 1460, 1468.) To the extent that Dr. Bishai based his June 2017 on Plaintiff's symptoms of depression, the evidence of record supports the ALJ's finding that Plaintiff retained a greater functional capacity than Dr. Bishai endorsed.

### v.    *Plaintiff's Testimony and Reported Activities of Daily Living*

Lastly, Plaintiff's testimony and reported daily activities support the ALJ's decision to afford Dr. Bishai's June 2017 opinion little weight. On August 23, 2017, during her hearing before the ALJ, Plaintiff testified that she cooked meals, read to her children and watched

23

movies with them.  (R. at 51, 84-85, 87, 90-94.)  Plaintiff also stated that she could perform

household chores, including washing clothes and dishes, albeit with difficulty.  (R. at 86-88.)

When grocery shopping, Plaintiff stated that she could handle change and carry some groceries.

(R. at 52, 90.)  Plaintiff also reported that she drove to church and attended church services and

community events.  (R. at 49, 91-93.)  This testimony aligned with statements that Plaintiff made

to her treatment providers throughout the record regarding her activities of daily living and

showed that Plaintiff retained greater functional capacity than Dr. Bishai opined.  (R. at 550,

1569.)

        In sum, Plaintiff's medical records, testimony and reported activities support the ALJ's

decision to afford little weight to Dr. Bishai's June 2017 opinion.  Thus, the ALJ did not err.

    2.        ***The ALJ Did Not Err by Assigning Little Weight to Dr. O'Keefe's Opinion.***

        Plaintiff argues that the ALJ provided insufficient reasoning for assigning little weight to

consultative examiner, Dr. O'Keefe, whose opinion she alleges coincided with the record as a

whole.  (Pl.'s Mem. at 14-17.)  Defendant argues that the ALJ supplied appropriate reasoning for

affording Dr. O'Keefe's opinion little weight and that substantial evidence supports the ALJ's

decision.  (Def.'s Mem. at 18-20.)

        On July 13, 2015, Dr. O'Keefe conducted a mental status consultative examination to

determine if Plaintiff's mental health symptoms would interfere with her employability.  (R. at

1142.)  Plaintiff appeared distraught and tearful during the examination, but she kept organized

thoughts and did not appear overly anxious.  (R. at 1142.)  Plaintiff admitted to having suicidal

ideations in the past month, but she denied any present intention to harm herself.  (R. at 1144.)

Plaintiff appeared to have racing thoughts and difficulty staying focused.  (R. at 1144.)  Testing

Plaintiff's mental capabilities, Dr. O'Keefe observed that Plaintiff could not concentrate

sufficiently to spell the word "world" correctly backwards, but after she realized her mistake, she could perform the task correctly.  (R. at 1144.)  Plaintiff could not complete a Serial Sevens test,[6] but she could multiply five by five and add eighteen and eleven.  (R. at 1144.)  Plaintiff could not perform a simple, three-step verbal command, but she could perform a simple, one-step command correctly.  (R. at 1144.)

Based on Plaintiff's mental status examination and answers to interview questions, Dr. O'Keefe diagnosed Plaintiff with major depressive disorder, PTSD, generalized anxiety disorder and a mild cannabis use disorder.  (R. at 1145.)  Dr. O'Keefe offered a "guarded" prognosis and concluded that Plaintiff could not perform routine or complex tasks as she did in the past.  (R. at 1146.)  Dr. O'Keefe opined that Plaintiff's current level of apathy and lethargy affected her ability to maintain regular attendance in the workplace, that Plaintiff could not maintain emotional stability sufficient to perform work tasks on a consistent basis and that Plaintiff would need "quite a lot of supervision."  (R. at 1146.)  Although Plaintiff could understand and follow simple instructions, Dr. O'Keefe reiterated that, in Plaintiff's "current state of mind," she would need "considerable supervision . . . [,] repetition and redirection" to complete tasks on a consistent basis.  (R. at 1146.)  Finally, Dr. O'Keefe assessed that Plaintiff would have "some difficulty" interacting appropriately with co-workers and the public due to her "low tolerance for frustration" and "considerable negative thoughts."  (R. at 1146.)

The ALJ assigned Dr. O'Keefe's opinion little weight for three reasons.  First, the ALJ found that Dr. O'Keefe based his opinion on a one-time examination.  (R. at 31.)  Indeed, the regulations explicitly permit an ALJ to consider the nature and length of the treatment period to

---

[6]     Serial Sevens testing assesses mental functioning by requiring a subject to count down from one hundred in increments of seven.  Robert Thomas Manning, *The Serial Sevens Test*, 142 Archives of Internal Medicine 1192 (1982).

determine the appropriate assignment of weight to an opinion. §§ 404.1527(c)(2), 416.927(c)(2). Although conducting a one-time examination constitutes an inherent aspect of Dr. O'Keefe's role as a consultative examiner, nothing in the regulations bars the ALJ from considering the short length of Dr. O'Keefe's treatment relationship with Plaintiff as one factor among others in assigning little weight to the opinion.

Second, the ALJ found Dr. O'Keefe' opinion "vague" due to his use of undefined terms like "a lot" or "difficulty." (R. at 31.) Although the Fourth Circuit has found an ALJ's reasons for discounting a medical opinion insufficient where the ALJ described the opinion as "rather vague and general in nature" without discussing "what aspects of that opinion he found overly vague," *Woods v. Berryhill*, 888 F.3d 686, 695 (4th Cir. 2018) (citing *Monroe*, 826 F.3d at 190), the ALJ here specifically pointed to Dr. O'Keefe's failure to define the terms "a lot" or "difficulty" as the vague aspects of his opinion. (R. at 31.) Thus, the ALJ's explanation proves legally sufficient.

Moreover, although Plaintiff further argues that "[s]ome 'difficulty' interacting is a common term for describing a claimant's ability to function socially," (Pl.'s Mem. at 16 (collecting cases)), the Court agrees with the ALJ that such language proves vague in this context. Although "difficulty" may constitute a clearly defined term in some contexts, *see, e.g.*, *Mitchell v. Colvin*, 2016 WL 843310, at *6 n.8 (M.D.N.C. Mar. 1, 2016) (explaining that "[a global assessment functioning score] of 61 to 70 reflects '[s]ome mild symptoms . . . OR *some difficulty* in social, occupational, or school functioning'" (quoting Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 16 (5th ed. 2013) (emphasis added))), district courts in this Circuit have found no error where an ALJ characterizes as vague a medical opinion using the same or similar language, *see Bushaw v. Berryhill*, 2018 WL 1972711, at *6

n.5 (W.D.N.C. Apr. 26, 2018) (affirming ALJ's decision to discount medical opinion stating that plaintiff had "some difficulty sustaining attention" due to anxiety and depression, because the opinion used vague terms); *see also Chavis v. Berryhill*, 2018 WL 1033267, at *13 n.5 (D. Md. Feb. 22, 2018) (finding no error where ALJ afforded some weight to doctor's opinion, because the doctor did not specify the meaning of "some difficulty" when describing the plaintiff's ability to stand, walk and travel for prolonged periods). Moreover, the ALJ appropriately pointed to the ALJ's failure to define the term "a lot" as another area in which Dr. O'Keefe's opinion proved vague — a finding with which existing caselaw agrees. *See, e.g.*, *Eurey v. Berryhill*, 2017 WL 6349240, at *2 (W.D.N.C. Dec. 12, 2017) (ALJ properly discounted vague medical opinion that did not define the term "significant"), *report and recommendation adopted*, 2017 WL 6349240, at *4; *Gallardo v. Berryhill*, 2017 WL 1409575, at *7 (M.D.N.C. Apr. 20, 2017) (ALJ appropriately described medical opinion using terms "may" and "some" as vague), *report and recommendation adopted*, 2017 WL 2623884 (M.D.N.C. June 16, 2017).

Lastly, the ALJ discounted Dr. O'Keefe's opinion, because Plaintiff had received only conservative medical treatments and reported improvements in her symptoms to her physicians; thus, the opinion lacked consistency with the record as a whole. (R. at 31.) Indeed, the month before Dr. O'Keefe's examination, on June 3, 2015, Plaintiff presented to Dr. Koduri with a tearful affect, in distress and appearing uncomfortable; yet, Plaintiff displayed normal intelligence, normal memory and unimpaired judgment. (R. at 1045-47, 1142.) On September 2, 2015, Plaintiff reported improvement to Dr. Koduri and denied experiencing depression. (R. at 1153-54.) Dr. Koduri described Plaintiff's condition as "stable" and "much improved." (R. at 1154.) The rest of Plaintiff's medical records reflected that, although she experienced anxiety and depression, and frequently displayed a tearful affect, Plaintiff retained a cooperative

demeanor, appeared alert and oriented, denied suicidal and homicidal ideations, and

demonstrated normal memory, judgment and insight. (R. at 1139, 1142, 1181-83, 1263, 1299-

1301, 1404-05, 1460, 1468.) And, as the ALJ noted, Plaintiff's treatments for her symptoms did

not extend beyond medication and counseling. (R. at 1046, 1300.)

Accordingly, substantial evidence supports the ALJ's decision to afford Dr. O'Keefe's

opinion little weight and the ALJ supplied appropriate reasoning for doing so.

### 3.   *The ALJ Did Not Err by Assigning Little Weight to Nurse Oswald's Opinion.*

Plaintiff also argues that the ALJ provided legally insufficient reasoning for assigning

Nurse Oswald's opinion little weight. (Pl.'s Mem. at 17-18.) Defendant responds that the ALJ

supplied legally sound reasoning for discounting Nurse Oswald's opinion, and that substantial

evidence supports the ALJ's decision. (Def.'s Mem. at 20-21.)

On May 12, 2017, Plaintiff met with Nurse Oswald for a mental capacity assessment,

which consisted of a check-the-box mental impairment questionnaire. (R. 1480-83.) Nurse

Oswald listed depression, bipolar disorder and panic attacks as Plaintiff's primary diagnoses. (R.

at 1480.) Nurse Oswald found that Plaintiff had moderate limitations in her ability to remember

locations and work-like procedures and her ability to understand and remember detailed

instructions, but she found marked limitations in Plaintiff's ability to remember very short and

simple instructions. (R. at 1480.)

With respect to sustained concentration and persistence, Nurse Oswald found that

Plaintiff had moderate limitations in her ability to carry out short and simple instructions, to

carry out detailed instructions and maintain attention and concentration for extended periods. (R.

at 1480.) Nurse Oswald opined that Plaintiff had marked limitations in her ability to complete a

normal workday and workweek without interruptions from her psychological symptoms. (R. at

1480.)  With respect to social interactions, Nurse Oswald found that Plaintiff had slight

limitations in her ability to ask simple questions and request assistance, accept instructions and

respond to criticism from supervisors and maintain socially appropriate behavior, and Plaintiff

had moderate limitations in her ability to get along with co-workers or peers without distracting

them.  (R. at 1481.)  Finally, Nurse Oswald found Plaintiff slightly limited in her ability to set

realistic goals or make plans independently, with no limitations in her ability to be aware of

normal hazards, take precautions or use public transportation.  (R. at 1482.)

Nurse Oswald checked the "unknown" box in several functional areas, including

Plaintiff's ability to perform activities within a schedule, maintain regular attendance and be

punctual within customary tolerances, sustain an ordinary routine without special supervision,

work in coordination with or in proximity to others without being distracted by them, make

simple work-related decisions, and perform at a consistent pace with a standard number and

length of rest periods.  (R. at 1480-81.)  Nurse Oswald also checked "unknown" for the number

of work absences that she believed Plaintiff would have in an average month.  (R. at 1481.)

The ALJ assigned little weight to Nurse Oswald's opinion, because it lacked internal

consistency, and because Nurse Oswald checked "unknown" for several questions.  (R. at 31.)

Specifically, the ALJ found that Nurse Oswald's finding that Plaintiff had *moderate* limitations

in her ability to understand *detailed* instructions did not comport with her finding that Plaintiff

had *marked* limitations in her ability to understand *short* and *simple* instructions.  (R. at 31.)

Plaintiff argues that Nurse Oswald's opinion aligned internally, because simple tasks

"could be even harder for Plaintiff to understand and remember, due to her inability to focus or

control her emotions."  (Pl.'s Mem. at 18; R. at 1480.)  The Court finds this argument unavailing.

The legend on Nurse Oswald's mental capacity assessment stated that a "marked" limitation

29

denoted a "serious limitation" such that "[t]he individual cannot generally perform satisfactorily" in the given area of functioning. (R. at 1480.) On the other hand, the legend explained that a "moderate" limitation meant that, although "[t]he individual will have intermittent difficulty performing" in the area, she can generally — but not always — perform satisfactorily. (R. at 1480.) The proposition that Plaintiff would struggle less with understanding and remembering detailed instructions than very short and simple instructions proves logically flawed, which the ALJ aptly noted. (R. at 31.)

In addition to internal inconsistencies, Nurse Oswald's opinion proved inconsistent with her only prior examination, or with the record as a whole. In December 2016, Plaintiff presented to Nurse Oswald, complaining of increased anxiety and depression. (R. at 1260-64.) On examination, Plaintiff appeared calm, cooperative and made eye contact. (R. at 1263.) Plaintiff also had normal speech, intact memory and average intelligence, and she appeared alert and oriented. (R. at 1263.) Although Plaintiff displayed a sad and irritable mood and tearful affect, Plaintiff had intact thought processes, unremarkable thought content and no suicidal ideations. (R. at 1263.) The rest of the record likewise reflected that, despite her tearful affect and symptoms of anxiety and depression, Plaintiff appeared cooperative, alert and oriented with unimpaired judgment, normal memory, normal intelligence and intact insight. (R. at 1045, 1106, 1142, 1263, 1522, 1526.)

Plaintiff's own testimony further undermined the limitations expressed by Nurse Oswald. During her hearing, Plaintiff testified to her ability to count change while grocery shopping and handle her own financial matters. (R. at 52, 89-90.) And Plaintiff's own admissions regarding her attendance at church and other community events do not agree with the social and communicative limitations Nurse Oswald assessed. (R. at 91-93.)

Lastly, the ALJ appropriately discounted Nurse Oswald's opinion, because she checked "unknown" in several areas of functioning, meaning that she could not assess Plaintiff's abilities based on her own examination or a review of the medical records. (R. at 1480-83.) The regulations specifically instruct that, "because nonexamining sources have no examining or treating relationship with [the claimant], the weight [the ALJ] will give their medical opinions will depend on the degree to which they provide supporting explanations for their medical opinions." §§ 404.1527(c)(3), 416.927(c)(3). Nurse Oswald's selection of "unknown" for several areas of functioning demonstrated her lack of familiarity and insight into Plaintiff's condition. Nurse Oswald noted that Plaintiff could not focus on the assessment due to her constant, tearful episodes, but she did not otherwise provide significant explanations to support her opinion. (R. at 1480.) Accordingly, substantial evidence supports the weight assigned to Nurse Oswald's opinion and the ALJ did not err.

### 4.    *The ALJ Properly Developed the Record.*

With respect to Dr. O'Keefe's and Nurse Oswald's opinions, Plaintiff argues that the ALJ should have contacted those sources if she had any uncertainty or needed clarification about the meaning of their opinions. (Pl.'s Mem. at 16-18.)

The ALJ "has a duty to explore all relevant facts and inquire into the issues necessary for adequate development of the record, and cannot rely only on the evidence submitted by the claimant when that evidence is inadequate." *Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986) (citations omitted). Although Plaintiff bears the burden of proving her disability, *Hall v. Harris*, 658 F.2d 260, 264 (4th Cir. 1981) (citations omitted), the ALJ retains the responsibility to develop the record in all proceedings, *Sims v. Apfel*, 530 U.S. 103, 110-11 (2000). When a claimant appears *pro se* before the ALJ, "the ALJ ha[s] a heightened duty of care to adequately

31

develop the record." *Craig*, 76 F.3d at 591. But when a claimant appears at the hearing with counsel — as Plaintiff did here — the ALJ may assume that the claimant "is making [her] strongest case for benefits." *Stuckey v. Colvin*, 2016 WL 403651, at \*11 (E.D. Va. Jan. 11, 2016) (quoting *Nicholson v. Astrue*, 341 F. App'x 248, 253 (7th Cir. 2009) (citation omitted)); (R. at 44.)

During the hearing, the ALJ specifically asked Plaintiff's counsel whether she had the opportunity to review the record, whether the record appeared complete and whether she had any objections to any exhibits contained in the record. (R. at 45.) Plaintiff's counsel responded affirmatively to the first two questions and did not have any objections to the record. (R. at 45.) In her opinion, the ALJ detailed the medical evidence, including Plaintiff's mental health treatment history, as well as the opinion evidence, Plaintiff's testimony and her reported activities of daily living, (R. at 21-31), and the ALJ stated that she based her opinion upon consideration of all of the evidence of record, (R. at 32); *see Reid v. Comm'r of Soc. Sec.*, 769 F.3d 861, 865 (4th Cir. 2014) (when the ALJ states that she based her opinion upon consideration of the entire record, the Court "takes her at her word" (citation omitted)). Finding no support for Plaintiff's suggestion that the ALJ's duty to inquire dictated that she reach out to Dr. O'Keefe or Nurse Oswald for additional information, and because the ALJ supplied appropriate reasoning for discounting those sources' opinions, the undersigned rejects Plaintiff's argument that the ALJ erred by failing to further develop the record.

**B.    The ALJ's Failure to Account for Plaintiff's Ability to Stay on Task in the RFC Assessment, or in the Alternative, Failure to Explain Why Plaintiff's Moderate Limitations in Concentration, Persistence and Pace Did Not Translate into Additional RFC Restrictions Requires Remand.**

Relying on *Mascio*, 780 F.3d at 638, Plaintiff argues that the ALJ erred by failing to include all of Plaintiff's mental limitations in the RFC and the corresponding hypothetical posed

to the VE; thus, remand is required. (Pl.'s Mem. at 19.) In *Mascio*, the Fourth Circuit stressed

the distinction between the ability to perform simple tasks and the ability to stay on task. 780

F.3d at 638. Only an RFC assessment that includes the latter limitation sufficiently reflects a

claimant's moderate difficulties with concentration, persistence and pace. *Id.* Plaintiff argues

that, because she suffered from moderate limitations in concentration, persistence and pace, the

ALJ should have included limitations in the RFC beyond a restriction to simple, routine tasks.

(Pl's Mem. at 19.) Defendant responds that the ALJ did not err, because she explained why

Plaintiff's moderate limitations in concentration, persistence and pace did not translate into

additional RFC limitations. (Def's Mem. at 21.)

After step three of the analysis, but before deciding whether a claimant can perform past

relevant work at step four, the ALJ must determine the claimant's RFC. 20 C.F.R.

§§ 404.1520(e)-(f), 404.1545(a)(1), 416.920(e)-(f), 416.945(a)(1). In analyzing a claimant's

abilities, an ALJ must first assess the nature and extent of the claimant's physical and mental

limitations and then determine the claimant's RFC for work activity on a regular and continuing

basis. §§ 404.1545(b), 416.945(b). Generally, the claimant bears the responsibility to provide

the evidence that the ALJ utilizes in making his RFC determination; however, before making a

determination that a claimant is not disabled, the ALJ must develop the claimant's complete

medical history, including scheduling consultative examinations if necessary. §§ 404.1545(a)(3),

416.945(a)(3). The RFC must incorporate impairments supported by the objective medical

evidence in the record and those impairments that have basis on the claimant's credible

complaints. §§ 404.1545(e), 416.945(e). The ALJ must conduct a function-by-function analysis

in assessing a claimant's RFC, and remand may be appropriate in cases where the ALJ fails to

assess a claimant's capacity to perform relevant functions, or where the ALJ's analysis contains

inadequacies that frustrate meaningful review. *Mascio*, 780 F.3d at 635-36. The assessment must include a narrative discussion of how the evidence supports each conclusion, citing specific medical facts and non-medical evidence, including daily activities and observations. SSR 96-8p.

If the ALJ finds that the claimant has moderate difficulties in maintaining concentration, persistence or pace at step three, the ALJ must address these difficulties when formulating Plaintiff's RFC. *Mascio*, 780 F.3d at 638. Post-*Mascio*, reviewing courts must ensure that ALJs have appropriately accounted for these limitations in formulating the RFC. *See Kearson v. Colvin*, 2016 WL 4318968, at *5-6 (E.D. Va. Aug. 12, 2016) (finding that the RFC inadequately accounted for the plaintiff's moderate difficulties); *see also Handy v. Comm'r*, 2015 WL 9302972, at *3 n.4 (D. Md. Dec. 22, 2015) (explaining the distinction between moderate limitations and mild or no limitations). But the Fourth Circuit did not hold that a finding of moderate limitations in concentration, persistence or pace automatically translates to a limitation in the RFC. *Mascio*, 780 F.3d at 638. Instead, the ALJ may exclude those mental limitations from the RFC if he or she explains why the limitations do not affect the claimant's ability to work. *Id.* Without this explanation, the Court must remand the ALJ's decision. *Id.*

Here, the ALJ found that Plaintiff had moderate difficulties maintaining concentration, persistence and pace at step three. (R. at 20.) To support this finding, the ALJ cited to instances in the record in which Plaintiff displayed mood disturbances, crying spells, easy distractibility, impaired thought content and concentration deficits. (R. at 20.) The ALJ also noted instances in which Plaintiff displayed normal intelligence, unimpaired memory and organized thoughts, and the ALJ cited to Plaintiff's ability to prepare meals, perform household chores, manage finances, follow instructions, read and write. (R. at 20.)

Relying on the opinion evidence, medical records and Plaintiff's reported activities, the

ALJ limited Plaintiff to simple, routine tasks, occasional interaction with supervisors and co-workers, no interaction with the public and a few changes in the routine work setting. (R. at 21.) None of these limitations account for Plaintiff's ability to stay on task. *See Ollis v. Berryhill*, 2017 WL 7167171, at *12 (E.D. Va. Dec. 18, 2017) (restricting plaintiff to limited interaction with the public and co-workers does not satisfy *Mascio*, because the limitation addresses "[plaintiff's] social functioning, rather than his additional, moderate limitations in concentration, persistence, and pace" (collecting cases)), *report and recommendation adopted*, 2018 WL 627386 (E.D. Va. Jan. 30, 2018); *Handy v. Comm'r,* 2015 WL 9302972, at *3 (limiting plaintiff to "simple, routine, repetitive tasks involving short, simple instructions in an environment with few workplace changes, no public contact, and only brief, infrequent contact with supervisors and co-workers not requiring teamwork or collaboration" did not account for plaintiff's moderate limitations in concentration, persistence and pace).

Neither did the ALJ properly explain why Plaintiff's moderate limitations in concentration, persistence and pace did not translate into additional limitations in the RFC. Discussing the medical evidence, the ALJ noted Plaintiff's diagnoses of depressive disorder, anxiety disorder, PTSD and bipolar disorder, as well Plaintiff's symptoms of suicidal ideations, decreased concentration, decreased appetite and decreased motivation, and the ALJ stated that the record contained "limited mental health treatment records." (R. at 26.) The ALJ then discussed cardiac examinations in November 2014, January 2015 and February 2015 during which Plaintiff appeared emotional or tearful, and an appointment in April 2015 during which Plaintiff appeared cooperative, yet tearful and angry, with a labile mood and suicidal ideations. (R. at 27.)

Next, the ALJ noted that Plaintiff stopped taking her antidepressants in May 2015 due to

side effects, and that she appeared depressed, sad and tearful during that appointment. (R. at 27.) The ALJ remarked that Plaintiff again appeared uncomfortable and cried during an appointment in June 2015. (R. at 27.) The ALJ noted that Plaintiff "was easily distracted" and had impaired thought content, but she denied suicidal ideations and displayed intact insight. (R. at 27.) The ALJ further discussed Plaintiff's August 2016 emergency department visit, during which the hospital sent Plaintiff to its psychiatric unit after she admitted having suicidal ideations. (R. at 27-28, 1386, 1402, 1405.) The ALJ noted that Plaintiff had fair memory recall and appeared alert and oriented, but she displayed a depressed mood, with a tearful and flat affect, and had not taken her medication as prescribed. (R. at 28.)

The ALJ further cited to an appointment in December 2016 during which Plaintiff displayed intact memory, average intelligence and appeared cooperative and calm, but she experienced increased symptoms of depression, displayed an irritable mood with a tearful affect and reported not taking her medication as prescribed. (R. at 28.) Ultimately, the ALJ concluded that "the evidence as a whole [did] not support limitations beyond those described in the . . . [RFC]," and the ALJ found "no evidence that [Plaintiff] required inpatient hospitalization or intensive outpatient therapy to address her mental health symptoms." (R. at 28.)

An ALJ's discussion of normal mental health status examinations and unremarkable mental health treatment records can satisfy the ALJ's duty to explain why a claimant's moderate limitations in concentration, persistence and pace do not translate into additional RFC limitations. *McCornell v. Berryhill*, 2018 WL 2244620, at *11 (D.S.C. May 16, 2018), *aff'd sub nom. McCornell v. Comm'r of Soc. Sec. Admin.*, 748 F. App'x 514 (4th Cir. 2019); *see Mascio*, 780 F.3d at 638 (noting that ALJ must explain why claimant's moderate limitations in concentration, persistence and pace did not translate into a limitation in the RFC). For example,

in *McCornell*, the district court explained that:

> Although the ALJ did not explicitly state that Plaintiff had no difficulty staying on task, he cited evidence that supported such a conclusion. He specified that "[t]reatment records reflect[ed] that the claimant ha[d] displayed alert and oriented presentation, intact attention, fair judgment and insight, logical and goal-directed thought processes, normal thought content, intact concentration, intact memory, and intact associations." He pointed out that only one treatment note had shown "circumstantial thought process, poor judgment, poor remote memory, easily distracted, and mildly impaired concentration." He concluded that "most of the clinical findings ha[d] been normal and that most of Plaintiff's statements suggested he was doing well on medication [*sic*]."

2018 WL 2244620, at *11 (finding that ALJ "provided a thorough discussion to support his conclusion that [p]laintiff's moderate limitation in concentration, persistence, or pace did not further limit his RFC"). Here, the ALJ similarly highlighted appointments during which Plaintiff appeared alert, oriented, calm and cooperative, displayed normal memory, average intelligence, intact insight, and denied suicidal or homicidal ideations, but the ALJ's discussion of the medical evidence also contained numerous references to Plaintiff's crying spells and tearful affect. (R. at 21, 26-28.) Moreover, the ALJ afforded great weight to the opinions of the state agency psychological consultants,[7] Howard S. Leizer, Ph.D., and Ryan Mendoza, Psy.D., both of whom opined that Plaintiff's tearful affect and crying spells would make it difficult for Plaintiff to sustain concentration. (R. at 28-30, 158-59, 195-96.) Yet, the ALJ failed to address why these findings did not translate into greater limitations.

On July 27, 2015, Dr. Leizer reviewed Plaintiff's medical records and conducted a mental

---

[7]    State agency medical consultants are highly qualified physicians who are experts in Social Security disability evaluation. 20 C.F.R. §§ 404.1513a(b)(1), 416.913a(b)(1). Therefore, when considering the opinion of a state agency medical consultant, the ALJ must evaluate those findings just as he would for any other medical opinion. §§ 404.1513a(b)(1), 416.913a(b)(1). Unless the ALJ gives controlling weight to a treating source's opinion, the ALJ is required to explain the weight given to state agency opinions. §§ 404.1527(e), 416.927(e).

RFC assessment. (R. at 158-59.)  Dr. Leizer found Plaintiff moderately limited in her ability to carry out detailed instructions, maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance, complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods. (R. at 158.)  On September 29, 2015, Dr. Mendoza made the same findings as Dr. Leizer regarding Plaintiff's sustained concentration and persistence limitations. (R. at 195-96.)

Both doctors noted that Plaintiff suffered from "focus problems" and a low tolerance for frustration, adding that Plaintiff's frequent crying spells would limit her ability to sustain concentration, but both doctors opined that medication would help control her symptoms. (R. at 158-59, 194-96.)  Dr. Mendoza further assessed that "[w]ith stabilization on medications, [Plaintiff could] complete simple, routine tasks with limited social interactions." (R. at 196.) The ALJ gave great weight to the opinions of both state agency psychological consultants based on their specialized knowledge and the opinions' consistency with the record.

Despite giving Dr. Leizer's and Dr. Mendoza's opinions great weight, the ALJ failed to explain why their findings regarding Plaintiff's moderate limitations in sustaining concentration and performing at a consistent pace did not translate into additional limitations in the RFC. "The Fourth Circuit has held that an ALJ adequately accommodates a claimant's moderate difficulties in concentration, persistence, or pace by crediting medical opinions of record and considering the limitations the medical providers indicated as part of the RFC assessment." *McCornell*, 2018 WL 2244620, at *11 (citing *Sizemore v. Berryhill*, 878 F.3d 72, 82 (4th Cir. 2017)). In *Sizemore*, for example, the ALJ found that plaintiff had moderate limitations in maintaining concentration, persistence and pace, and limited the plaintiff to performing simple one- or two-step tasks in low

stress, non-production jobs with no public contact. 878 F.3d at 81. The court rejected the plaintiff's *Mascio* challenge, because the ALJ afforded significant weight to his doctors, who "made more detailed findings regarding [the plaintiff's] 'sustained concentration and persistence limitations[.]'" *Id.* at 81-82. Specifically, the plaintiff's doctors opined that he could maintain attention for at least two hours at one time, perform basic routine tasks "*on a sustained basis*" and "show *sustained attention* to perform simple repetitive tasks." *Id.* (emphasis in original). Because the ALJ gave those doctors' opinions significant weight, the court held that *Mascio* did not require remand, because substantial evidence supported the ALJ's finding that Plaintiff could stay on task while performing simple one- or two-step tasks in low stress non-production jobs with no public contact. *Id.* at 81.

In contrast to the opinions that the ALJ in *Sizemore* afforded significant weight, neither Dr. Leizer nor Dr. Mendoza found that Plaintiff could perform simple, routine work "on a sustained basis." *Sizemore*, 878 F.3d at 81; (R. at 157-59, 194-96). Thus, the ALJ's assignment of great weight to Dr. Leizer's and Dr. Mendoza's opinions failed to satisfy the ALJ's duty to explain why Plaintiff's moderate limitations in concentration, persistence and pace did not translate into limitations beyond those that the ALJ included in the RFC. *See Terri D. v. Berryhill*, 2018 WL 4688740, at *10 (W.D. Va. Sept. 28, 2018) (finding that ALJ's reliance on state agency consultants' opinions did not rescue ALJ's decision from remand under *Mascio*, because "although the . . . consultants opined that Terri D. could 'perform simple, routine work,' they did not say that she could sustain attention or persisten[ce] in such work for any amount of time before needing a break[.]" (citing *Sizemore*, 878 F.3d at 81 (internal citations omitted))).

In fact, both Dr. Leizer and Dr. Mendoza found Plaintiff moderately limited in her ability to perform at a consistent pace without an unreasonable number and length of rest periods,

emphasizing that Plaintiff's frequent crying spells would hinder her ability to sustain concentration. (R. at 158, 195.) And yet, the ALJ included no explanation in her opinion as to why these findings did not translate into an RFC restriction addressing Plaintiff's ability to stay on task. (R. at 28-30.) In *Greer v. Colvin*, the district court held that a similar lack of explanation required remand under *Mascio*, because although the ALJ afforded significant weight to the state agency consultant's opinion that plaintiff could perform simple tasks, "that same consultant also noted that [p]laintiff 'may have some *difficulty maintaining attention and concentration.*'" 2016 WL 1367745, at *8 (M.D.N.C. Apr. 6, 2016) (emphasis supplied). "[W]ithout further explanation, the ALJ's crediting of the state agency psychological consultant['s opinion did] not provide a 'logical bridge' . . . between the ALJ's findings that Plaintiff suffered moderate concentration deficits *and* that Plaintiff could perform simple, routine, repetitive tasks, without any further concentration-related restriction." *Id.* (quoting *Clifford*, 227 F.3d at 872) (emphasis supplied); *see also Worrell v. Berryhill*, 2018 WL 3852663, at *5 (W.D. Va. July 25, 2018) ("Without some explanation, it is not clear that the ability to follow 1-2-3 repetitive tasks addresses the extent of Worrell's ability to stay on task, and not just complete simple, repetitive work."), *report and recommendation adopted*, 2018 WL 3846328 (W.D. Va. Aug. 13, 2018). Here, the Court likewise finds that, absent additional explanation, the ALJ's assignment of great weight to Dr. Leizer's and Dr. Mendoza's opinions does not provide a logical bridge between the ALJ's findings that Plaintiff experienced moderate limitations in maintaining concentration, persistence and pace, and her finding that Plaintiff can perform "simple, routine tasks" and tolerate "a few changes in the routine work setting" without any additional "concentration-related" restrictions. *Greer*, 2016 WL 1367745, at *8; (R. at 21.)

Because the Court "[is] left to guess about how the ALJ arrived at [her] conclusions," *Mascio*, 780 F.3d at 637, the Court must remand. *See Monroe*, 826 F.3d at 189 (emphasizing ALJ's duty to "build an accurate and logical bridge from the evidence to [her] conclusion" (quoting *Clifford*, 227 F.3d at 872)); *Fox v. Colvin*, 632 F. App'x 750, 755 (4th Cir. 2015) (noting that the reviewing court cannot "speculate as to how the ALJ applied the law to its findings or . . . hypothesize the ALJ's justifications that would perhaps find support in the record).

## V.   CONCLUSION

For the reasons set forth above, the Court recommends that Plaintiff's Motion for Summary Judgment (ECF No. 14) be GRANTED, that Defendant's Motion for Summary Judgment (ECF No. 16) be DENIED and that the final decision of the Commissioner be VACATED and REMANDED pursuant to the fourth sentence of 42 U.S.C. § 405(g).

Let the Clerk forward a copy of this Report and Recommendation to Senior United States District Judge Henry E. Hudson and all counsel of record.

## NOTICE TO PARTIES

**Failure to file written objections to the proposed findings, conclusions and recommendations of the Magistrate Judge contained in the foregoing report within fourteen (14) days after being served with a copy of this report may result in the waiver of any right to a de novo review of the determinations contained in the report and such failure shall bar you from attacking on appeal the findings and conclusions accepted and adopted**

by the District Judge except upon grounds of plain error.

/s/
David J. Novak
United States Magistrate Judge

Richmond, Virginia
Date: July 22, 2019